UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-cr-20286-CMA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JEFFREY DAVID KAMLET,

     Defendant.

_____/

## MOTION TO SUPPRESS PHYSICAL EVIDENCE

The Defendant, by and through undersigned counsel, and pursuant to Rule 12(b)(3)(C) and Rule 41(h), *Federal Rules of Criminal Procedure*, the Fourth Amendment to the Constitution of the United States, and the further points and authorities set forth herein, moves to suppress certain evidence seized from locked safes located in his residence on March 9, 2023.

The Defendant further requests an evidentiary hearing to resolve all disputed factual matters relevant thereto.

The following is set forth in support[1]:

### I.    INTRODUCTION

The Defendant is charged in a single count Indictment with possession with intent to distribute a controlled substance, in violation of Title 21, Section 841(a)(1), in connection with items allegedly seized from a locked safe(s) in the bedroom closet of Defendant's residence pursuant to a State of Florida search warrant(s) executed on March 9, 2023. The controlled substances are Dimethyltryptamine; Ibogaine; Oxycodone; Hydrocodone; Morphine; Hydromorphone; and Ketamine.

---

[1] A Motion to Extend the page numbers for this Motion was submitted and granted, to permit 28 pages.  (D.E. 27).

## A.  FACTUAL BASIS

At all relevant times, Defendant was "a registered doctor in the State of Florida, currently practicing … [and] also the co-owner of a pain medication/addiction rehabilitation clinic located in Miami Beach, Florida."  Search Warrant Aff. at 6 (Attached as **Exhibit A**). On April 27, 2022, Miami Beach Police Officers were called to Defendant's residence to investigate the status of two teenage drug addicts (J.S. and T.O.) who allegedly had met Defendant earlier that evening and were present at his home. Upon arrival, the Officers interviewed J.S. and T.O. and then transported them to the Police Station in handcuffs. A month later, the Miami Beach Police closed the investigation as "unfounded", because "no allegations of criminal activities were made by either party on scene," and in the Lead Detective's view, "no crime ha[d] been committed". (See Miami Beach report attached as **Exhibit B**)

The specific chronology which led to the above events is as follows: In the days/weeks preceding April 27, 2022, J.S. and T.O. were both committed to a Broward County Hospital Psychiatric Ward, pursuant to the State of Florida's Baker Act. Each had significant histories of illegal drug use, mental illness, and being "runaways". While in the psych ward, J.S. and T.O. became friends and developed a plan to meet older rich men and extort them through the dating app Tinder.[2]

On April 27, 2022, J.S.'s mother contacted the Broward Sheriff's Office trying to locate her daughter. That same day, the mother of T.O. tracked her daughter's cell phone to Defendant's apartment. After receiving said notification, Miami Beach Police went to Defendant's address and located J.S. and T.O.  Upon their arrival, the Defendant immediately advised the police that both J.S. and T.O. stated they were over the age of 18, that they were drug addicts who he offered to

---

[2]  See, Statement of "TO", at 11-12, (Attached as **Exhibit C.**)

help, and that they were in fear of their pimp who brought them to Defendant's address.[3] Upon interviewing J.S. and T.O., police determined that they both lied (to the Defendant and to the Police) about their true ages, as well as other matters.

The two females were handcuffed, transported to the MBPD station and released to their parents. On May 3, 2022, this matter was assigned to Miami Beach Criminal Investigations Unit, under case #2022-35907. Assigned to investigate the case Miami Beach Police Department were Detective J. Nieves, Sgt. T. Houser, and Lt. T. Payne, who generated a report, and who made the following findings:

- T.O. suffers from a psychological disorder and is a recovering addict.
- "That upon being transported to the station no complaint of any criminal activities were made or reported by T.O., J.S., or Kamlet."
- That "the case is closed/unfounded as no allegations of criminal activities were made by either party on scene". (See Exhibit B)

Two months later, on **July 8, 2022**, Miami-Dade State Attorney Investigator Francisco Casanovas interviewed T.O., who confirmed she was "not a victim" of any crime, that she did not observe any improper or illegal conduct by/with Defendant, and that the only drugs she observed at his residence were provided to her by J.S., **not by Defendant**. See Exhibit C, Statement of T.O., July 8, 2022, at 18:5-10). It is noted that on April 27, 2022, J.S. made a similar statement to Miami Beach Law Enforcement, to the effect that she was not the victim of any crime, nor did she observe any improper/illegal conduct by Defendant.

Five months later, on September 6, 2022, Miami-Dade State Attorney Investigator Francisco Casanovas interviewed J.S., and who, in answering the Investigator's suggestive leading questions, she ultimately acquiesced and completely changed her initial story to agree with the

---

[3] See Statement of T.O, at 19-21. (Attached as Exhibit C).

Investigator's obviously desired answers. The completely changed version, fed to her by Casanovas, was that the Defendant had given her $600.00 for sex, and that she observed drugs at the residence, and that a similar incident had taken place approximately a month after the first.

Almost eleven (11) months after the aforementioned encounter, and 7 months after J.S.'s statement to S.A.O., Investigator Casanovas created an Affidavit for a Search Warrant to search Dr. Kamlet's residence.

Recognizing the staleness of the evidence he was seeking, Investigator Casanovas, at paragraph (6) addresses staleness concerns, from a "cut and pasted" affidavit from another case dealing with child pornography charges and suggesting a child porn investigation here.  In an effort to excuse the eleven-month gap here to search Defendant's residence, he states that such evidence *could* remain downloaded in computers for lengthy periods of time. Affiant Casanovas prays for a search warrant for… Aventura Police, Miami Dade County, City of Miami Police Florida Department of Law Enforcement, U.S. Secret Service, State Attorney Investigators, Homeland Security with which is further indication this application was cut and pasted, as these various sources had nothing whatsoever to do with this investigation.  Notably, because it was cut and pasted, there was no mention of the Miami Beach Police who were essential to serve and execute the warrant at Defendant's address.

During the 18 pages utilized by the affiant in his attempt to establish the legally required "timely" probable cause, the only reference to pornographic depictions was a reference by J.S., that when she entered the subject's residence "...The subject had an adult pornographic video … playing on the television in the living room".

On March 8, 2023, six months after the interview, **and more than 10 months after the initial encounter**, Investigator Casanovas secured a Search Warrant for Defendant's residence.

The Warrant was based almost exclusively upon the dramatically altered allegations of J.S., an addict/prostitute with numerous compelling reasons to question her reliability (as discussed herein), all well-known to Casanovas but deliberately concealed from the issuing Judge, the Honorable Laura Stuzin. Simultaneously with the Search Warrant, Casanovas secured an Arrest Warrant, based upon an Affidavit lacking probable cause, also discussed herein.  The allegations in the warrants were limited to J.S.'s "new and improved" version of events allegedly occurring on April 27, 2022, and the unspecified "second time".

On March 9, 2023, law enforcement executed the Warrants, taking Defendant into custody pursuant to an invalid Arrest Warrant, and commencing the search of his home. After several hours passed, the search was "paused", while a second warrant ("Warrant 2") to search "two safes" was applied for and approved by Judge Stuzin (See, **Exhibit J**). Approximately four hours later, another Affidavit and Application (for the safes on the property) was submitted to the Court, using the exact same "cut and pasted language, <u>without any additional specific reference or testimony on how the content of the safe(s) are connected to any criminal activity, or to the Defendant</u>. This second application and warrant were signed by the same judge and was executed when "ABC Locksmiths" were contacted, came and opened the safes (unreasonably destroying one and causing damage to the other), and the search of their contents began, yielding the evidence sought to be suppressed herein.

In addition to material omissions concerning the lack of reliability of J.S.; staleness of the information; facial deficiencies in the "Oath and Affirmation" and jurat; overbreadth/lack of particularity; and unreasonable execution; the Warrant also failed to comply with several provisions of Florida Statutes relating to Warrants.

**B. STANDING**

Individuals who have a legitimate expectation of privacy in the place searched have standing to challenge the validity of a government search. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The challenged search occurred in Defendant's home, and his standing is clear - As the Supreme Court has noted, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972), and "[t]he sanctity of the home is afforded special protection under the Fourth Amendment" *Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1327 (11th Cir. 2006).

**II.   PROBABLE CAUSE**

**A. "STATUTES VIOLATED" - AGE ELEMENT**

The Affidavit's section on "Statutes Violated" (Aff. at 2) was a laundry list of Florida Statutes, with one common gravamen, *to wit*: that the "victim" was under the age of 18. The Affidavit failed to establish probable cause of this essential element. More specifically, the <u>only</u> suggestion that J.S. may have been a minor is the unsupported introductory allegation explaining who the alleged parties were:

> … The primary "victim" in this case is J.S., a white female, DOB 03/07/2005, who was seventeen during the criminal incidents described below and is hereinafter referred to as "Victim J.S." …

Notwithstanding this introductory language (Aff, at 6), the Affidavit contained no **facts** upon which the issuing Judge could infer that J.S. was a minor, nor the "basis" or "source" of Affiant's alleged knowledge, or its reliability. Quite the contrary, the only **factual** allegations established exactly the opposite:

- J.S. told law enforcement that she was **19**.  (See Aff. at 7);

- Defendant told law enforcement that J.S said she was over 18 and that she showed him ID, *Id*.; and

- J.S. met Defendant after setting up an account on the dating site Tinder, Aff. at 9, which has a minimum age requirement of 18. As a law enforcement officer who "participated in many Human Trafficking investigations, both State and Federal, and investigated cases involving a wide range of Human Trafficking activities", the Affiant certainly knew or had reason to know that Tinder and other adult dating sites require all users to be over 18.

The failure to explain the basis or source of knowledge of J.S.'s alleged minority, combined with the substantial factual information in the Warrant establishing **just the opposite**, is fatal to probable cause as to each listed offense.

The import of this failure is underscored by the State proceedings related to the Affidavit in support of the **Arrest** Warrant (presented at the same time), which similarly failed to contain any factual allegation(s) concerning J.S.'s age[4]. At Defendant's first appearance in State Court, when the presiding Judge, the Honorable Mindy Glazer, was advised the Arrest Warrant Affidavit omitted this essential element of all offenses, she granted the State three (3) hours to submit a revised Affidavit establishing probable cause as to J.S.'s status as a minor.

### B.  THE ALLEGATIONS IN THE AFFIDAVIT WERE STALE

Although the Affidavit discussed events allegedly occurring from "April 27, 2022, through August 3, 2022." Aff. at 6, the Affidavit only discussed J.S.'s alleged observations at Defendant's residence on April 27, 2022, and an **undated** "second time". See Aff. at 10. The search warrant application was not presented until March 8, 2023, **more than ten months after the April 2022 event(s)**.

This is significant because courts "have developed a staleness doctrine in the context of probable cause which requires that the information supporting the government's application for a warrant must show that probable cause exists **at the time the warrant issues.**" *United States v.*

---

[4] The Arrest Warrant Affidavit (**Exhibit D**) even omitted the introductory statement re: J.S.'s DOB.

*Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000) (emphasis added). Unlike the allegations in the instant case, "[t]he information in the affidavit must be 'fresh,'" *United States v. Gladden*, 2024 WL 3373702 (11th Cir. July 11, 2024), alleging "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause **at that time**." *Sgro v. United States*, 287 U.S. 206, 210 (1932). See also, *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) ("For probable cause to exist … the information supporting of the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant.") (citing *Sgro*).

      1.      **The Affidavit's "Staleness Concerns" section is insufficient**

As to the safes, the Warrant(s) only authorized the search and seizure of "[a]ny safes **which may contain firearms and/or narcotics**." (emphasis added)

The Affiant properly recognized that due to the passage of time, general "Staleness Concerns" existed. However, the section devoted to those concerns was limited to "computer files", "electronic files on a hard drive" and similar items, and was silent as to why any **"firearms and/or narcotics"** information would be "fresh" **ten months later**. See Exhibit A, Aff. at 17. Also, although the Affidavit mentions firearms, there was no allegation that they were contraband, or otherwise subject to seizure. Moreover, the entire section was based upon information which the Affiant "learned" from unspecified "discussions with a forensic examiner in the field", without any assertion concerning the "examiner's" identification, reliability, basis of knowledge, *etc*. As such, the "Staleness Concerns" section is wholly inapposite and should be disregarded in its entirety in the staleness determination.

## C. THE GOVERNMENT MAY NOT RELY UPON THE "PRESUMED RELIABILITY" GENERALLY ACCORDED "VICTIM" WITNESSES

J.S. is not entitled to the general presumed reliability of a "victim" for two independent and compelling reasons.

### 1. The Affidavit does not establish probable cause that J.S. was a "victim".

Because the "four corners of the Affidavit"[5] lacked probable cause that J.S. was a minor (see above), it did not allege facts suggesting she was a "victim" of **any** crime, or that she was otherwise outside the "criminal milieu". Rather, as is established *infra*, at p.1 and <u>known to the Affiant</u>, she was a drug-addicted prostitute who was recently committed to the "psych ward" pursuant to the Baker Act, and devised a scheme to "use sex" "to meet wealthier guys or rich guys that [she/they] can manipulate or exploit", leading to her voluntary contact with Defendant.

Absent probable cause that J.S. was a "victim" or "law-abiding citizen", the "presumed reliability" generally accorded such witnesses is inapplicable.

### 2. **The Affidavit contains <u>material omissions</u> which strongly rebut any "presumption" of reliability and/or probable cause**

As a general rule:

> "An officer can rely upon a statement by a putative victim or eyewitness to establish probable cause **unless the officer has reason to doubt the witness's veracity**. Thus, … cases often focus on **whether the officer concealed information from the judge that tended to show that a particular witness lacks credibility**." *Washington v. Detective*, 29 F. 4th 93, 110 (2d Cir. 2022) (emphasis added).

As this Court has recognized, "[a] search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth . . . **and this rule includes material omissions**." *Sosa v. Hames*, 581 F. Supp. 2d 1254, 1270 (S.D. Fla. 2008) (emphasis

---

[5] "The four corners rule is a well-established precept of judicial review. … Judicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention." *Donovan v. Mosher Steel Co., Div. of Trinity Indus.*, 791 F.2d 1535, 1537 (11th Cir. 1986)

added). *Sub judice*, the Affiant "concealed" a great deal of crucial information which "tended to show" that J.S. "lacks credibility".

3. **General principles**

As noted, it is true that "[g]enerally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998). However, "there is a caveat to the general rule: victim complaints ordinarily establish probable cause '**absent circumstances that raise doubts as to the victim's veracity**.'" *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998) (emphasis added).

The Eleventh Circuit has specifically endorsed this exception:

> An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with a crime, has probable cause to effect an arrest **absent circumstances that raise doubts as to the victim's veracity**."
> *Christman v. Holmes*, 448 F. App'x 869, 872 (11th Cir. 2011) (emphasis added).

"As this Court [Former Chief Judge Moreno] affirmed, police officers may generally 'rely on a victim's statement to support probable cause' **absent allegations indicating that their reliance was unreasonable**." *Lawson v. City of Miami Beach*, 908 F. Supp. 2d 1285, 1290 (S.D. Fla. 2012) (emphasis added).

The Affiant was aware of very significant information which provided "reason to doubt" J.S., all of which he "concealed" from the issuing Judge. First and foremost, and setting the stage for the unprecedented amount of **further** omissions:

> **"no allegations of criminal activities were made by either party on scene."**
> **" … no investigation will occur, <u>as no crime has been committed</u>."**
> *Supplemental Report of Miami Beach Police Detective J. Nieves, August 31, 2022*

More specifically, the Affiant concealed from Judge Stuzin that the Miami Beach Police

Investigating Detective closed the case on May 26, 2022, as "unfounded", because "no allegations of criminal activities were made by either party on scene." (See Exhibit B, Supplemental Report of Detective J. Nieves, August 31, 2022).  Also omitted was that Detective Nieves had advised T.O.'s and J.S.'s mothers that "… no investigation will occur, **as no crime has been committed**." *Id*. (emphasis added).

The further omissions related to such highly relevant matters as J.S.'s long-standing history of drug abuse/status as a drug addict; her mental illness; her criminal activities; her material inconsistent statements to law enforcement; and her own mother's extremely negative assessment of her credibility; all set forth herein:

### 4.  **Material omissions from affidavit**

Approximately two weeks prior to meeting the Defendant, J.S. was involuntarily committed to "the psych ward" pursuant to "the Baker Act"[6]. J.S. was a drug addict, with "coke" and "Molly" as "drugs of choice". She also "like[d]" Fentanyl[7] [8]. J.S. procured "coke" and "Ecstasy" from her sources[9], had "been doing coke for a really long time"[10], and "ODs a lot."[11] She "suffer[ed] from bipolar disorder and depression" and it was unknown "if she was taking her prescribed medication" around the time of the relevant events[12].

Upon release from the "psych ward" (where J.S. and T.O. met shortly before the incident), they "would talk about and buy drugs together."[13] They also "made a Tinder account"[14] in order "to meet wealthier guys or rich guys that [they] can manipulate or exploit"[15]. J.S. was going to

---

[6] Recorded Statement of T.O. to Affiant, July 8, 2022, at 5.
[7] Recorded Statement of J.S. to Affiant, at 10, Exhibit E
[8] Recorded Statement of T.O. to Affiant, July 8, 2022, at 7.
[9] Recorded Statement of T.O. to Affiant, July 8, 2022, at 9.
[10] Recorded Statement of J.S. to Affiant, September 6, 2022, at 50.
[11] Recorded Statement of T.O. to Affiant, July 8, 2022, at 23.
[12] See **Exhibit F,** Davie Police Department Incident/Investigation Report, at 3.
[13] See **Exhibit G**, State Attorney's Office Report of Investigation, September 6, 2022, at 2.
[14] Recorded Statement of T.O. to Affiant, July 8, 2022, at 11.
[15] Recorded Statement of T.O. to Affiant, July 8, 2022, at 13.

"use sex"[16] to manipulate and exploit the victims. J.S. "matched" Defendant "on the Tinder app"[17]. J.S. and T.O "were planning to run away because they did not want to go to their pending residential rehab programs"[18]  J.S. had also "run away from a pimp in the past"[19].  She "had a fucked-up life"[20], and "doesn't like cops"[21].

**On April 27, 2022**, J.S. "got a ride from her drug pusher pimp"[22] to Defendant's residence[23], and later refused to tell law enforcement the pimp's name.[24] She also refused to provide her own phone number.[25]

At Defendant's apartment, J.S. and T.O. told Defendant they were "19 and 18[26], and falsely claimed that they needed a place to stay because they "were in fear of a male pimp who was threatening to take them".[27]

Once T.O. arrived, she and J.S. just "chilled" in a bedroom **by themselves** "doing coke and X"[28] while Defendant was asleep in his bedroom. According to T.O., **the drugs were provided by J.S.**[29], **not Defendant**. At no time did T.O. see Defendant "handle any drugs",[30] nor did he ever "give [her] anything."[31]  At no time did T.O. see or hear Defendant discuss, request, offer or

---

[16] Recorded Statement of T.O. to Affiant, July 8, 2022, at 13.
[17] State Attorney's Office Report of Investigation, September 6, 2022, at 2.
[18] State Attorney's Office Report of Investigation, September 6, 2022, at 2.
[19] *Id.*
[20] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 21.
[21] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 22.
[22] State Attorney's Office Report of Investigation, September 6, 2022, at 2.
[23] Recorded Statement of J.S. to Affiant, September 6, 2022, at 6.
[24] Recorded Statement of J.S. to Affiant, September 6, 2022, at 7.
[25] Recorded Statement of J.S. to Affiant, September 6, 2022, at 56.
[26] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 19.
[27] They later admitted to law enforcement that this was a lie. (See, **Exhibit H**, report of Officers Beltran and Gomez, at 1.) Notably, this is what they told Defendant who repeated it to the Officers upon their arrival.
[28] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 17.
[29] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 17.
[30] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 18.
[31] Recorded Statement of  T.O. to Affiant, July 8, 2022, at 36.

engage in sexual activity with her or J.S. Following the encounter at Defendant's residence, J.S. and T.O. were handcuffed and transported to the Miami Beach Police Station.

J.S. consistently denied any sexual activity or other criminal conduct <u>until law enforcement suggested</u> that Defendant was a "sexual predator". More specifically, at the police station, J.S. was asked "Did a crime happen today?" and she replied "No". She was then asked, "Are you the victim of a crime?" and again answered "No". An Officer then told J.S. that Defendant was going to be placed on the "Sexual Predator list", and that "**He's wanted for that**". **J.S. appeared visibility shaken and replied "he's wanted? ... seriously?" and the officer replied, "He didn't tell you that?"**[32]. At no point prior to the officer's statements (or even for months thereafter) had J.S. alleged sexual activity or any criminal conduct. As to T.O., although the Affidavit alleged, she was a "victim", when she (T.O.) gave her statement to Affiant in July 2022 and he suggested she was "a victim", she corrected him that "I'm not a victim".

**J.S.'s own mother told law enforcement that "[J.S.'s] stories don't make sense [and] I don't trust her anyway."** (emphasis added). A month later - when the investigating Detective informed the mother that the case was being closed as unfounded, she more fully "explained [J.S.'s] history of defiance, drug use and mental disorders"[33].

Months later, on July 19, 2022, Affiant learned J.S. "had overdosed again"[34] and was once more "involuntarily Baker Acted" and "in an institution awaiting … commit[ment] under the Marchman Act."[35] The Marchman Act requires either substantially impaired judgment or a likelihood of danger to self or others. On August 19, 2022, Affiant learned that J.S. "dropped out

---

[32] **Clearly, the officer made this up to induce the reaction received. There was never any indication, this assertion was true**.
[33] See **Exhibit B**,  Investigative Supplemental Report of Det. Nieves, submitted 8/31/22.
[34] State Attorney's Office Report of Investigation, July 19, 2022, at 1.
[35] *Id*.

of the Marchman Act rehab program" and was last seen in the company of "two Black males" [unidentified][36].

Three weeks later, and almost 5 months after being at Defendant's residence, J.S. made - **for the first time** - the allegations which formed the basis of the search warrant Affidavit, **and which she had specifically denied in earlier interaction with law enforcement**, also while facing consequences for dropping out of the Marchman Act rehab program.

Crucially, the Affidavit contained no discussion of the circumstances under which J.S. arrived at her dramatically different version of events.

The totality of these material omissions were clearly such which "any reasonable person would know that a judge would want to know", *Wilson v. Russo*, *infra*, before issuing a warrant, and impacted a proper assessment of J.S.'s reliability:

       4.   **Drug use/addiction**

The Affidavit painted a highly misleading picture of the nature, extent and duration of J.S.'s drug abuse, with numerous material omissions directly relevant to her reliability. As the *Eleventh Circuit Pattern Jury Instructions, Criminal Cases*, Instruction S1.3, recognizes, allegations by a "witness using addictive drugs … should [be] consider[ed] … with more caution than the testimony of other witnesses." The Eleventh Circuit has acknowledged **"the inherent unreliability of such witnesses"** as the underlying reason for such an instruction. *United States v. Solomon*, 856 F.2d 1572, 1579 (11th Cir. 1988) (emphasis added). As support for this proposition, the Court relied upon *United States v. Kinnard*, 150 U.S. App. D.C. 386, 465 F.2d 566, 572-73 (1972), which recognized that "… **as a matter of accepted knowledge and experience there is an increased danger that addict-informers will lie**". (emphasis added) Following up on the

---

[36] State Attorney's Office Report of Investigation, August 19, 2022, at 1-2.

majority opinion, a concurrence stressed the "serious problem of unreliability." presented by "addict informants." *Id*, at 577.  All told, it is generally known that "narcotics addicts are notorious liars" *Baldwin v. Huffman Towing Co.*, 51 Ill. App. 3d 861, 864 (1977).

Additionally (and also deliberately concealed from the issuing Judge), one of J.S.'s drugs of choice was "Molly", aka Ecstasy or MDMA. Per the DEA, Molly acts as a **hallucinogen**, and produces "distortions in time and perception …"[37], "[m]emory difficulties"[38] and "confusion", which "may occur soon after taking the drug or during the days or even weeks thereafter."[39]

### 5.   J.S. was part of the "criminal milieu"

Unlike innocent victims or other "law-abiding citizens" whose reliability may be "presumed", "[i]ndividuals who are involved in criminal activity or who enjoy the confidence of criminals are members of the criminal milieu, and their reliability or credibility must be established.**"** *Chatman v. Sayler*, 2022 WL 4182248 (2022), at *25 (D.N.D. Sep. 13, 2022). The totality of circumstances known to Affiant clearly established that J.S. was far more than a mere "innocent victim", or "law-abiding citizen", but rather, an integral part of the "criminal milieu".

As Professor LaFave notes, "claims [by law enforcement] that their information was received from an average citizen who was a victim of or, more likely, a witness to criminal activity **should be viewed with healthy skepticism** when the nature of the criminal conduct alleged and the relationship of the 'citizen' to that activity is more typical of that found when informants from the criminal milieu are utilized." 2 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, section 3.4(a) (6th Edition) (2024 update)(emphasis added)

---

[37]  See, Ecstasy Or MDMA (also Known As Molly) (dea.gov)
[38]  FC-MOLLY.pdf (dea.gov)
[39]  Ecstasy_Molly.pdf (nj.gov) U.S. Department of Health and Human Services, National Institutes of Health, National Institute on Drug Abuse

J.S.'s extensive criminal activity is significant because "[t]he citizen eyewitness's account is [generally] credible because eyewitnesses are seldom involved with the miscreants or the crime." *United States v. Burbridge*, 252 F.3d 775, 779 (5th Cir. 2001) In and of itself, "the failure to reveal an informant's criminal history can be a factor necessitating a *Franks* hearing." *United States v. Sanford*, 35 F.4th 595, 600 (7th Cir. 2022). <u>Yet here, this and so much more was omitted.</u>

### 6. **Mental health issues**

Judge Stuzin was also entitled to know J.S. had very recently been committed to the "psych ward" pursuant to the "Baker Act", not once, but twice. **"Individuals subject to Baker Act commitment proceedings are individuals who likely have a serious mental illness …"** *Doe v. State*, 217 So. 3d 1020, 1032 (Fla. 2017) (emphasis added) . See also, discussion of Marchman Act, *supra* at 13.  J.S. also suffered from bipolar disorder and depression, and it was unknown if she had been taking her medications. Such mental health history is highly relevant to reliability. See, *e.g.*, *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir. 1983)("[c]ertain forms of mental disorder have high probative value on the issue of credibility.");  *United States v. Partin*, 493 F.2d 750, 763 (5th Cir. 1974)("A defendant has "the right to attempt to challenge [a witness'] credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which he was attempting to testify."); *United States v. Wheeler*, 16 F.4th 805, 828 (11th Cir. 2021)(listing "mental capacity" as one of the "grounds of impeachment").

### 7. **Prior inconsistent statements and deception**

Material omissions of prior inconsistent statements further deprived Judge Stuzin a full and fair opportunity to evaluate whether J.S. was entitled to presumed reliability. See, *e.g.*, *Florida Standard Jury Instructions in Criminal Cases*, Instruction 3.9 (One factor in "decid[ing] what evidence is reliable" is "[d]id the witness at some other time make a statement that is inconsistent

16

…"); *Eleventh Circuit Pattern Jury Instructions, Criminal Cases*,   B6.1 ("Impeachment of Witnesses Because of Inconsistent Statements  … ask whether … at some other time a witness said or did something, or didn't say or do something, that was different …"). Subject to fuller development at an evidentiary hearing, the Affidavit omitted **at least** the following material prior inconsistent statements of J.S.:

- On April 27, J.S. specifically **denied** to Officers of the Miami Beach Police Department that "a crime happen[ed]" at Defendant's residence;

- J.S specifically denied to those Officers that she was "the victim of a crime";

- J.S. never alleged to law enforcement that she observed drugs in Defendant's apartment, or that he provided same to her, until she changed her story ( obviously being influenced by leading questions of Investigator Casanovas)  after her second Baker Act commitment, almost 5 months later;

- Once she changed her story, J.S. claimed Defendant "made [her] ingest the remaining cocaine in the bedroom prior to TO's arrival," ROI, at 3, but Affiant knew from T.O. that upon T.O.'s arrival, the two had ingested "coke and X", **which were provided by J.S.**, **not Defendant**. See, T.O., at 17.  Also, Affiant viewed a video recording of J.S. at the police station "twice reaching into what appears to be her vaginal area and twice bringing a finger to her nose consistent with the possible hiding and snorting of cocaine."; Aff., at 8.

- J.S. acknowledged that she had "told [the cops] a bunch of bullshit." See Exhibit E, statement of J.S. at 1;

- J.S. told Officers of the Miami Beach Police Department that she initially met Defendant a year prior, on the Beach, <u>which Affiant knew was false</u>.

   *Finally, her own mother told law enforcement that J.S.'s "stories don't make sense [and] I don't trust her anyway."* The omission of this **single** fact, by the person who has known J.S. longer (and presumably better) than anyone else, might well **in and of itself** be a "material omission" dispositive of reliability.

### 8.  Cumulative impact

   In "answering the question … whether a more complete and accurate affidavit would have nevertheless supported  a  finding  of probable  cause …  [the court must]  take  into  account

the cumulative effect of the multiple omissions and misstatements in the affidavit." *Jordan v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019). Essentially, "[t]he magistrate judge must be given the opportunity to assess the totality of the circumstances,", *United States v. Simmons*, 771 F. Supp. 2d 908, 918 (N.D. Ill. 2011), which was compellingly denied here. The cumulative impact doctrine is well known in a variety of contexts in our jurisprudence, and of particular significance here, given the alarming extent and nature of the omissions.

> *Sub judice*, just as in *Simmons*, *supra*:
>
> While the omission of each individual fact may not necessarily lead to the conclusion that [Affiant] acted with reckless disregard for the truth, the **cumulative effect of all of the omissions was to eliminate nearly every indicator detracting from the [informant's] reliability**. There was nothing left to put the issuing judge on notice of the omitted facts.
>          …
> Any other result [but suppression] would lead to a system that just encourages police officers to mislead busy state court judges to issue warrants and then claim "good faith" reliance on warrants issued in good faith by judges who have not assessed the totality of the circumstances. **The Fourth Amendment demands more**. *Id.*, at 927 (emphasis added)
> **The Affiant made further material misrepresentations/omissions concerning "<u>victim T.O.</u>"**

In a highly improper and misleading attempt to bolster the allegations made by J.S., Casanovas included upwards of twenty separate references to "*Victim T.O*", or "the *victims*" (plural) in the Affidavit, and also alleged that "your Affiant took a sworn statement of *Victim T.O.*" (Aff., at 8)

These were material misrepresentations/omissions, for the following reasons:

a. **Affiant did not in fact ever take a sworn statement of T.O.**  Affiant's effort to enhance the allegations by stating that "Victim T.O." provided information **under oath** was provably false. The July 8, 2022 "interview" was never sworn to. See **Exhibit C,** Transcript of T.O. interview (confirming that no oath was administered before, during or after the interview)

b. **T.O. was not a "victim".** Similarly, Affiant's effort to enhance the allegations by repeatedly referring to T.O. as "Victim T.O." is also provably false: 1) On the scene of the April 27, 2022 incident which formed the basis of the warrant, T.O. specifically

advised law enforcement that no crime had occurred; 2) On May 26, 2022, the Miami Beach Police Lead Detective closed the investigation because "no crime ha[d] been committed; and 3) During the July 8, 2022 interview, when Casanovas attempted to categorize T.O. as a "victim", she emphatically replied **"I'm not a victim"**. Exhibit C, at 9.[40]

### III.   MISCELLANEOUS ADDITIONAL DEFECTS IN THE SEARCH WARRANT[41]

#### A.   THE WARRANT'S AUTHORIZATION TO SEIZE "ALL NARCOTICS …" WAS OVERBROAD; VIOLATED THE FOURTH AMENDMENT'S "PARTICULARITY" REQUIREMENT; AND DID NOT JUSTIFY THE SEIZURE OF <u>LAWFULLY POSSESS</u>ED DRUGS

"The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Similarly, "[a] warrant which fails to sufficiently particularize the … things to be seized is unconstitutionally overbroad." *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000). The Warrant authorized the seizure of "**Any and all narcotics**, including Cocaine, Xanax, Oxycodone, Subutex, and drug paraphernalia." (emphasis added). **<u>Of the seven drugs which Defendant is charged with possessing, only one, Oxycodone, was mentioned in the Affidavit at all</u>**. Affiant knew that Defendant was "a registered doctor in the State of Florida, currently practicing medicine… [and] also the co-owner of a pain medication/addiction rehabilitation clinic".

Accordingly, the request to seize, **without limitation**, "all narcotics" possessed by a medical physician, <u>licensed to prescribe these drugs, was overbroad and improper</u>. Rather, the Warrant and resulting seizure(s) should have been confined to any narcotics which were "evidence and an instrumentality of a felony crime", **particularly because** the "probable cause" which Affiant claimed he "believed" (and the Judge found to exist) was limited to exactly that - "probable

---

[40] After reviewing both statements of JS and TO, it is no wonder that Casanovas was asked to resign from the SAO, his latest placement with law enforcement. Presently, he was listed last at Biscayne Park Police department.

[41] See Exhibit J, Search Warrant of Premises

cause to believe … that **evidence and an instrumentality of a felony crime**" was located at the premises. See Aff, at 1, Warrant, at 1 (emphasis added).

Florida Statute § 933.02, strictly limits the "Grounds for search warrant", and the only arguable "grounds" applicable to this case are the following:

- "When any property shall have been used … As a means to commit any crime";

- "When any property constitutes evidence relevant to proving that a felony has been committed";

- When any property is being held or possessed "[i]n violation of the laws relative to food and drug.

The Affidavit lacked probable cause that the drugs the Defendant is charged with possessing were "a means to commit any crime", "evidence relevant to proving that a felony has been committed", or "possessed in violation of the laws relative to food and drug."  It was known to the Affiant that as a pain management doctor, **specializing in addiction many of the seized drugs are routinely prescribed to aid in the withdrawal process**. Accordingly, the command to seize "*All narcotics …*", *without limitation* to those which fell into one of these categories, violated § 933.02. Similarly, those drugs are not "Property Subject to Search or Seizure" under Fed Rules Crim Pro R 41, since the Affidavit lacked probable cause that they were "evidence of a crime"; "contraband, fruits of crime, or other items illegally possessed"; or "property designed for use, intended for use, or used in committing a crime."

The command to seize "All Narcotics …" authorized a "general, exploratory rummaging" which the Fourth Amendment prohibits. As the Supreme Court has explained, the Fourth Amendment requires that "those searches deemed necessary should be as limited as possible," and the "specific evil" that limitation targets "is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). See

also, *United States v. Sedlak*, 697 F. App'x 667, 668 (11th Cir. 2017) ("**Any evidence seized as the result of an overbroad warrant must be excluded from the trial** …") (Emphasis added).

Finally on this point - the Warrant[42] by its terms expressly limited the seizure and search of Defendant's safes to "[a]ny safes which may contain firearms and/or narcotics." Warrant, at 3. Since no probable cause existed to justify seizure of "firearms", and the "all narcotics" authorization was unconstitutionally overbroad, the authorization to seize and search "[a]ny safes which may contain firearms and/or narcotics" was equally unavailing.

## B. THE EXECUTION OF THE SEARCH WARRANT WAS UNREASONABLE

"Whether a search conducted pursuant to a warrant is lawful requires consideration of two issues: the validity of the warrant itself **and the reasonableness with which the officers executed the search**." *United States v. Schwinn*, 376 F. App'x 974, 980 (11th Cir. 2010). "Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) "In other words, even when supported by probable cause, **a search or seizure may be invalid if carried out in an unreasonable fashion.**" *Franklin v. Foxworth*, 31 F.3d 873, 875 (9th Cir. 1994). (emphasis added).

The search and seizure of Defendant's safes was "carried out" in an "unreasonable fashion" for two reasons - First, the executing officer violated the spirit and intent of fundamental Fourth Amendment protection - *to wit*: "assur[ing] the individual whose property is searched or seized of the **lawful authority** of the executing officer, his need to search, **and the limits of his power to search,**" *Groh v. Ramirez*, 540 U.S. 551, 561 (2004)(emphasis added). Second, the executing officer's needless destruction of Defendant's property was not "reasonable". See, *e.g.*, 2 LaFave,

---

[42]  See Exhibit K, Warrant for safes.

*Search and Seizure: A Treatise on the Fourth Amendment*, section 4.10(d) (6th Edition) (2024 update) ("Absent some plausible explanation, a search warrant execution which commenced with conduct damaging to property without prior exhaustion of other possibilities … should be deemed unreasonable.")

### 1. Lawful authority and limits of power to search

Body cam footage is critical here to the Court's analysis.[43] Casanovas is heard advising Defendant he had a Warrant "authorizing me to search your entire house and premises **and safes** …" (emphasis added), Defendant asked a simple, respectful question concerning the "lawful authority" and "limits of power to search", *to wit*: "Where does it say safes?" Casanovas refused to answer. **<u>Defendant calmly explained his main concern - he was a Doctor and had "office drugs" in the safe</u>**. Casanovas refused to show Defendant the relevant section of the Warrant. Defendant can be seen asking a second time about authorization to search the safes, and told the officer, **"Before you transport [me], show me where it says safes and I'll open it for you." Casanovas again refused to answer the question.** When Defendant inquired for a third time, Affiant's shocking response was "listen, **<u>I don't have time for this bullshit</u>**", and then "**If its not there, I'm gonna get another search warrant** for your safes, so don't worry". Defendant was then removed from his residence (pursuant to the invalid Arrest Warrant) without further discussion. These comments failed to "assure" Defendant of Casanovas' "lawful authority", and "limits of his power to search", and were highly unreasonable.

### 2. Unnecessary Destruction of property

Casanovas unreasonably chose to have "ABC Locksmiths" break into the safes, thus destroying Defendant's property. "It is … clear that **a seizure that is lawful at its inception can**

---

[43] A thumb drive with the Body Cam worn during the execution of the search will be made available to the Court upon request, or at a hearing.

violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (emphasis added). These "protected interests" include "possessory interests". *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). "[T]he United States Supreme Court has recognized that destruction of property during the execution of a lawful warrant may violate the Fourth Amendment if "excessive or unnecessary." *United States v. Whisnant*, 2008 WL 4500118, at *3-4 (E.D. Tenn. July 26, 2007), citing *United States v. Ramirez,* 523 U.S. 65, 71 (1998).

Federal and Florida law codify the circumstances where it is "reasonable" for officers to break open items such as a safe during execution of a search warrant, *to wit*: "[t]he officer may break open … any part of a house **or anything therein**, to execute the warrant, **if after due notice of the officer's authority and purpose he or she is refused … access** to anything therein. Florida Statute § 933.09 (emphasis added). See also, 18 U.S.C. § 3109 (substantially verbatim). **Because Defendant specifically advised the executing officer "… show me where it says safes and I'll open it for you", the officer was not "refused access"** to the safes, and their destruction was not "reasonable" under the Fourth Amendment.

## IV.   THE "AFFIDAVIT" LACKED A PROPER "OATH OR AFFIRMATION"

The "Affidavit" on its face presents *prima facie* reason to question whether it satisfies the Fourth Amendment's "Oath or Affirmation" clause:

- The Affidavit does not contain the "seal" of Judge Stuzin or "the Court", **as required** by Florida Statute § 92.50[44]
- The Affidavit does not contain a proper acknowledgment signature after the "Sworn to and subscribed before me" language;[45]

---

[44] "The jurat, or certificate of proof or acknowledgment, shall be authenticated by the signature **and official seal of such officer or person** …" (emphasis added)
[45] *Id.*  See also, further discussion, *supra at 26,* of Fla. Stat. § 92.50.

- The Affidavit does not contain verification that Affiant was known to the subscriber (Judge Stuzin) or provided identification, as required for proper notarization under Florida Statute § 117.05[46];

- The Affidavit's assertion that Affiant was "first duly sworn"[47] does not establish that it was "under penalty of perjury"; and

- The Affidavit on its face did not indicate Affiant was swearing that the facts are "true and correct", but only that he "says he has probable cause to believe and does believe that evidence and an instrumentality of a felony crime is located …"

The Fourth Amendment provides that "no Warrants shall issue, **but upon** probable cause, **supported by Oath or affirmation**." U.S. Const. amend. IV, (emphasis added). The Florida Constitution only permits Affidavits. Art. I, § 12, Fla. Const. ("No warrant shall be issued except upon probable cause, **supported by affidavit** …").  See also, Fla. Stat. § 933.05 ("A search warrant cannot be issued except upon probable cause **supported by affidavit or affidavits** …")

**The mere fact that a document is titled an "Affidavit" does not control if it fails to contain a proper jurat or otherwise comply with notarial requirements.** See, *e.g.*, *Person v. Camillus House*, 2023 WL 2716398, at *2 n.1 (S.D. Fla. Mar. 10, 2023) (emphasis added) ("Although this document is titled an 'affidavit,' it is not made under penalty of perjury and the

---

[46] Florida law provides that "[a] notary public may not notarize a signature on a document unless he or she `personally` knows, or has satisfactory evidence, that the person whose signature is to be notarized is the individual who is described in and who is executing the instrument. A notary public shall certify in the certificate of acknowledgment or jurat the type of identification, either based on personal knowledge or other form of identification, upon which the notary public is relying. Fla. Stat. § 117.05. **The statute which permits Judges to administer oaths does not provide an exception to this "certification" requirement.** See, §92.50.

[47] Courts have questioned the sufficiency of affidavits which contain "duly sworn" or similar language, but no **indication that Affiant "swore" under penalty of perjury**. See, *e.g.*, *Bates v. Atl. Transp. Inc.*, , 2021 WL 75163, at *1 (S.D. Ind. Jan. 8, 2021) (affidavit stating that affiant was "duly sworn" insufficient because "it [did] not state that any of the statements contained therein are 'true and correct' and under 'penalty of perjury,' and the 'duly sworn' language does not demonstrate that the affiant knew he was signing under the penalty of perjury"); *Trapaga v. Cent. States Joint Bd. Local 10*, 2007 WL 1017855 (N.D. Ill. Mar. 30, 2007) ("The affidavits … which attest to the truth of the statements therein only 'under penalties of the law,' are not sufficient; that language is simply too vague to suggest that the affiants knew they were signing under penalty of perjury. The court strikes those four affidavits in their entirety …"); *Kauffman v. Trans High Corp.*, 2020 WL 136588 (M.D. Fla. May 13, 2020)

notary acknowledgment section is not completed [**and therefore] is not, in fact, a true affidavit** …”);  *Wood v. Sec'y, Dep't of Corr*., 793 F. App'x 813, 819 (11th Cir. 2019)(“Wood did not actually submit an affidavit … but instead only a letter with a purported notary stamp, which does not comply with the requirements of Florida law [which] requires that a notary public complete ‘a jurat or notarial certificate,’ which has several requirements that are missing from Rowe's purported affidavit.”)

Further, the assertion only of Casanovas’ subjective “belief” is particularly troublesome given the well-established rule that “[p]robable cause … cannot be established simply by showing that the police subjectively believed that probable cause existed” *United States v. Cooper*, 949 F.2d 737, 744 (5th Cir. 1991). See also, *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998) (“this Circuit explicitly rejected the idea that the subjective belief of the arresting officer is relevant to the determination of whether probable cause exists.”)

### 1.  Signature and seal of the Court – Florida Statute § 92.50

There is a troubling failure to comply with Florida law concerning oaths administered by Judges. A Judge’s authority to administer an oath derives from Florida Statute § 92.50, which empowers “any judge” to “take” or “administer” “Oaths” and “affidavits”. **However**, **the Statute requires that “[t]he jurat, or certificate of proof or acknowledgment, shall be authenticated by the signature and official seal** of such officer or person taking or administering the same…” When the official is a Judge, “the seal of such court may be affixed as the seal of such officer or person.” Fla. Stat. Ann. § 92.50.  The purported “Affidavit” lacks a proper jurat, including the Judge’s 1) signature and her 2) seal or the seal of the Court.[48]

---

[48]  Also, the next statutory section, which requires that a document be verified, explains that the document must be signed or executed by a person and that the person must state under oath or affirm that the facts or matters stated or recited in the document are true, or words of that import or effect. Fla. Stat. Ann. § 92.525.

Clearly, the purpose of the "Judge's Initials" space at the bottom of each page was to verify that each page is in fact the one reviewed, **however, it is not intended to substitute for the signature line of a proper "jurat, or certificate of proof or acknowledgment".** This point is compellingly illustrated by reference to the **Arrest** Warrant Affidavit in this case, which did contain the required signature line and Judge Stuzin's full signature. **It is abundantly clear that Affiant simply omitted this signature line in the Search Warrant Affidavit**.

For all of the above reasons, the purported "Affidavit" should be viewed as an "unsworn declaration" pursuant to 28 U.S.C. §1746, and remains deficient even under that statute, because it lacks the required declaration that the matters were asserted "under penalties of perjury" and are "true and correct".

### 2.   THE SEARCH WARRANT FAILS TO COMPLY WITH FLORIDA STATUTORY REQUIREMENTS – §§ 933.07, 933.05 AND 933.02

Florida Statute § 933.07 governs "Issuance of Search Warrants" and requires that a Warrant "command" the officers "to bring the property and any person arrested in connection therewith before the judge or some other court having jurisdiction of the offense." The "Command" section of the instant Warrant contains no such language. Florida Statute § 933.05 requires that a search warrant "shall be returned within 10 days after issuance thereof." An analogous federal provision states that "[t]he officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant ..." Fed Rules Crim Proc R 41. The challenged Warrant(s) was not timely "returned". Florida Statute **§**933.02 establishes the "Grounds for issuance of search warrant", which was not complied with herein.  (See discussion above, at p. 7).

Defendant acknowledges that the above-described failures to comply with Florida search warrant statutory requirements may not, **in and of themselves**, require suppression. **However**,

they are quite relevant in the "totality of circumstances" establishing Affiant's blatant and repeated disregard of established and necessary rules, procedures and protections of Fourth Amendment rights.

### IV.     SUBSEQUENT SEARCH WARRANT TO SEARCH SAFES

The search and seizure occurred on March 9, 2023, contemporaneous with an Arrest Warrant presented to and authorized by Judge Stuzin the same time as the Search Warrant. The Arrest Warrant lacked probable cause, because the Affidavit did not allege J.S.'s age.

Nonetheless, Defendant was taken into custody and transported to the Police Station and the search/seizure began. After several hours had passed, the search was "paused", while a second search warrant ("Warrant 2") to search "two safes" was applied for and approved by Judge Stuzin. See Warrant 2, at 1. Approximately four hours later, "ABC Locksmiths" opened the safes (and unnecessarily destroyed them in the execution, see *supra*) and the search began, yielding the evidence sought to be suppressed herein.

To the extent the government seeks to rely upon this second Warrant, it is infirm for the following reasons:

1. Warrant 2 and its Affidavit suffer from the identical defects identified in the body of this Motion;
2. Warrant 2 is "fruit of the poisonous tree" of the initial unlawful search;
3. Warrant 2 does not "particularly describe" the property to be searched, and
4. Warrant 2 fails to allege - much less establish probable cause - that the safes were connected to the Defendant or found at his residence.

Warrant 2 describes "the premises to be searched" as "two safes", but the Affidavit fails to establish any connection between the safes and the Defendant, his residence, or the "criminal activity" being investigated. See generally, *United States v. Schieferle*, 2024 WL 1905326, at *2

(11th Cir. May 1, 2024) ("… the affidavit submitted in support of the search warrant must 'establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'").

### V.   THE EXCLUSIONARY RULE IS NECESSARY HERE TO DETER "RECURRING OR SYSTEMIC NEGLIGENCE"

This unique case presents a particularly compelling example where suppression is required. "The 'prime purpose' of the exclusionary rule "is to deter future unlawful police conduct.'" *United States v. Lynch*, 934 F.2d 1226, 1234 (11th Cir. 1991). "As laid out in [Supreme Court] cases, the exclusionary rule serves to deter deliberate, reckless, or **grossly negligent conduct, or in some circumstances recurring or systemic negligence**." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 702 (2009); *United States v. Cooper*, 2024 WL 1765707, at *2-3 (11th Cir. Apr. 24, 2024) (same) (emphasis added)

The Affiant deliberately and recklessly omitted a staggering quantum of material facts; relied upon stale information; violated several Florida Statutes; including §§ 933.07, 933.05 and 933.02; and the search/seizure was otherwise "unreasonable" for reasons stated herein. Suppression is the only means to "deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures" *United States v. Calandra*, 414 U.S. 338, 347-48 (1974).

### CONCLUSION

The Supreme Court has long cautioned that a "proceeding by search warrant is a drastic one and must be carefully circumscribed so as to prevent unauthorized invasions of the sanctity of a man's home and the privacies of life." *Berger v. New York*, 388 U.S. 41, 58 (1967). Because of this, "the Fourth Amendment, … together with legislation regulating the process, should be liberally construed in favor of the individual." *Sgro v. United States*, 287 U.S. 206, 210 (1932)

For the reasons set forth above, this Motion should be granted.

## REQUEST FOR HEARING

Defendant requests a hearing on this Motion.  A defendant is entitled to an evidentiary hearing on a motion to suppress if he "allege[s] facts that, if proved, would require the grant of relief." *United States v. Torres*, No. 22-12996, 2024 WL 1174023 (2024), at *5 (11th Cir. Mar. 19, 2024). The allegations in this Motion, if proved, would require relief.

## *FRANKS* ISSUE – SPECIAL CONSIDERATIONS

Under settled law, **"[a] search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, and this rule includes material omissions**." *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002) (emphasis added). "Material omissions, like material falsehoods, may give rise to entitlement to a *Franks* hearing." *United States v. Gladden*, 2024 WL 3373702, at *26 (11th Cir. July 11, 2024).

This Motion sets forth numerous material omissions and/or misrepresentations concerning the lacking reliability of J.S. "[T]o be entitled to an evidentiary hearing on a motion to suppress based on misrepresentations or omissions in a search warrant affidavit, a defendant must make a substantial preliminary showing that: (1) the affiant made a false statement; (2) the false statement was made either intentionally or with reckless disregard for the truth; and (3) the false statement was necessary to the finding of probable cause. See *Franks*, 438 U.S. at 171-72. "The defendant's allegations must be accompanied by a statement of reasons and affidavits or otherwise reliable statements of witnesses, or an explanation for their absence." *United States v. Schieferle*, 2024 WL 1905326 at *3 (11th Cir. May 1, 2024) The required "statement of reasons" is set out within the body of this Motion.

In the case of allegedly material **omissions**, "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a

judge would want to know" when deciding whether to issue a warrant." *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000). As shown *supra*, the quantum of omitted facts "that a judge would want to know" is staggering.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 88.9(a), undersigned counsel conferred with Assistant United States Attorney frank Tamen who objects to the relief sought in this motion.

Respectfully Submitted,

Dated: February 13, 2025

JAYNE C. WEINTRAUB, ESQ.
Sale & Weintraub, P.A.
2 South Biscayne Blvd., Suite 2100
Miami, FL 33131
Telephone: (305) 374-1818
E-mail: jweintraub@saleweintraub.com

By: *s/Jayne C. Weintraub*
    Jayne C. Weintraub, Esq.
    Florida Bar No. 320382

HERBERT COHEN, ESQ.
600 South Andrews Ave., Suite 407
Ft. Lauderdale, FL 33301
Telephone (954) 766-8820
E-mail: hcohen@herbcohenlaw.com

By: *s/Herbert M. Cohen*
    Herbert M. Cohen, Esq.
    Florida Bar No. 258806